**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FIRST NATIONAL BANK OF PENNSYLVANIA, A NATIONAL BANKING ASSOCIATION, AS ADMINISTRATIVE AGENT,** | **CIVIL ACTION NO.** _____ |
| **Plaintiff,** | |
| **v.** | |
| **MATTHEW S. DIGGS A/K/A SCOTT DIGGS, PAUL ADKISON, CHRISTOPHER JEFFCOAT, MARK ADKISON, DAVID COSPER, PETER HARDING, JENNIFER HARDING, BRIAN BRTALIK, RUSSELL SCOTT POOL, JAKE SCOLDS, MARK BOLTZ, LIFT IT RENTALS, LLC, LIFT IT HOLDINGS, LLC, LIFT IT CAPITAL, LLC, LIFT IT RENTALS TWO, LLC, LIFT IT RENTALS THREE, LLC, LIFT IT RENTALS FOUR, LLC, LIFT IT RENTALS FIVE, LLC, LIFT IT RENTALS SIX, LLC, LIFT IT RENTALS SEVEN, LLC, LIFT IT RENTALS EIGHT, LLC, LIFT IT RENTALS NINE, LLC, LIFT IT RENTALS TEN, LLC, LIFT IT XL, LLC, LIFT IT XL TWO, LLC, LIFT IT XL THREE, LLC, LIFT IT XL FOUR, LLC, CAROL ADKISON, CAROLYN H. RILEY, MICHAEL SALAMONE, RICH CARCICH, AMY M. WEATHERFORD, PETER DOYLE, JOE BERNARD JR., ROGER FRASIER, EQUITY TRUST COMPANY, RICHARD E. LEIGHTON, MICHAEL A. COWAN, STEVEN W. WEAVER AS TRUSTEE OF THE STEVEN W. WEAVER REVOCABLE TRUST, MICHAEL BLAIR AS TRUSTEE OF THE ELIZABETH BLAIR IRREVOCABLE TRUST, JWI, LLC, ROBERT PLAZZO, GARY FONTANA, LIFT IT MSA, LLC, CO-X HOLDINGS, LLC, LIFT-IT PL-1, LLC, CO-X ADVISORY GROUP, LLC,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT

Plaintiff First National Bank of Pennsylvania, a National Banking Association, as Administrative Agent under the Credit Agreement (as defined below) ("**Bank**"), by and through its undersigned counsel, Buchanan Ingersoll & Rooney PC, files the within Complaint.

## PARTIES

1. The Bank is a national banking association with its principal place of business located at 12 Federal Street, Pittsburgh, PA 15212.

2. Defendant Matthew S. Diggs a/k/a Scott Diggs ("**Diggs**") is an individual who upon information and belief resides at 1113 Southeast 8th Street, Fort Lauderdale, Florida 33316.

3. Defendant Paul Adkison ("**Adkison**") is an individual who upon information and belief resides at 8715 Longview Club Drive, Waxhaw, North Carolina 28173.

4. Defendant Christopher Jeffcoat ("**Jeffcoat**") is an individual who upon information and belief resides at 5212 Concord Highway, Monroe, North Carolina 28110.

5. Defendant Mark Adkison ("**M. Adkison**") is an individual who upon information and belief resides at 246 Cornice Drive, La Vergne, Tennessee 37086.

6. Defendant David Cosper ("**Cosper**") is an individual who upon information and belief resides at 161 Splendor Ridge Drive, Franklin, Tennessee 37064.

7. Defendant Peter Harding ("**P. Harding**") is an individual who upon information and belief resides at 1050 Old Academy Road, Fairfield, Connecticut 06824.

8. Defendant Jennifer Harding ("**J. Harding**") is an individual who upon information and belief resides at 1050 Old Academy Road, Fairfield, Connecticut 06824.

9. Defendant Brian Brtalik ("**Brtalik**") is an individual who upon information and belief resides at 9005 Longview Club Drive, Waxhaw, North Carolina 28173.

2

10.    Defendant Russell Scott Pool ("**Pool**") is an individual who upon information and belief resides at 12028 Royal Lytham Court, Charlotte, North Carolina 28277.

11.    Defendant John L. Scolds a/k/a Jake Scolds ("**Scolds**") is an individual who upon information and belief resides at 641 North Avenue NE Apartment 4105, Atlanta, Georgia 30308.

12.    Defendant Mark Boltz ("**Boltz**") is an individual who upon information and belief resides at 404 Montrose Drive, Waxhaw, North Carolina 28173 (Boltz, together with Diggs, Adkison, Cosper, P. Harding, J. Harding, Brtalik, Pool and Scolds the "**Equity Owners**").

13.    Defendant Lift It Rentals, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals**").

14.    Defendant Lift It Holdings, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Holdings**").

15.    Defendant Lift It Capital, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Capital**").

16.    Defendant Lift It Rentals Two, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Two**").

17.    Defendant Lift It Rentals Three, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Three**").

18.    Defendant Lift It Rentals Four, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Four**").

19.     Defendant Lift It Rentals Five, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Five**").

20.     Defendant Lift It Rentals Six, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Six**").

21.     Defendant Lift It Rentals Seven, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Seven**").

22.     Defendant Lift It Rentals Eight, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Eight**").

23.     Defendant Lift It Rentals Nine, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Nine**").

24.     Defendant Lift It Rentals Ten, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals Ten**").

25.     Defendant Lift It Rentals XL, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals XL**").

26.     Defendant Lift It Rentals XL Two, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals XL Two**").

27.     Defendant Lift It Rentals XL Three, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals XL Three**").

28.     Defendant Lift It Rentals XL Four, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Rentals XL Four**").

29.     Defendant Carol Adkison ("**C. Adkison**") is an individual who upon information and belief resides at 9124 Sandpiper Drive, Charlotte, North Carolina 28277.

30.     Defendant Carolyn H. Riley ("**Riley**") is an individual who upon information and belief resides at 53 Sea Island Drive, Georgetown, South Carolina 29440.

31.     Defendant Michael Salamone ("**Salamone**") is an individual who upon information and belief resides at 100 Highland Forest Drive, Charlotte, North Carolina 28270.

32.     Defendant Rich Carcich ("**Carcich**") is an individual who upon information and belief resides at 271 East 2nd Street, Ocean Isle Beach, North Carolina 28469.

33.     Defendant Amy M. Weatherford ("**Weatherford**") is an individual who upon information and belief resides at 1911 Wickersham Lane, Corinth, Texas 76210.

34.     Defendant Pete Doyle ("**Doyle**") is an individual who upon information and belief resides at 975 Flintlock Road, Southport, Connecticut 06890.

35.     Defendant Joe Bernard Jr. ("**Bernard**") is an individual who upon information and belief resides at 2726 Lemon Tree Lane, Charlotte, North Carolina 28211.

36.     Defendant Roger Frasier ("**Frasier**") is an individual who upon information and belief resides at 5438 W. Orchard Avenue, Visalia, California 93277.

37.     Defendant Equity Trust Company in its capacity as Custodian FBO (i) Michael Cowan, IRA 410113, (ii) Joe Povinelli, Roth IRA 200337610, and (iii) Joe Povinelli, IRA 200337609 ("**Equity Trust**") is upon information and belief an Ohio corporation having a mailing address of PO Box 441159, Westlake Ohio 44145.

38.     Defendant Richard E. Leighton ("**Leighton**") is an individual who upon information and belief resides at 1060 Griffin Creek, Greensboro, Georgia 30642.

39.     Defendant Michael A. Cowan ("**Cowan**") is an individual who upon information and belief resides at 3907 Pomfret Lane, Charlotte, North Carolina 28211.

40.     Defendant Steven W. Weaver as Trustee of the Steven W. Weaver Revocable Trust ("**Weaver**") is a trust for which, upon information and belief, the trustee's citizenship is the state of North Carolina, having an address for notice at 6233 Glynmoor Lakes Drive, Charlotte, North Carolina 28210.

41.     Defendant Michael Blair as Trustee of the Elizabeth B. Blair Irrevocable Trust ("**Blair**") is a trust for which, upon information and belief, the trustee's citizenship is the state of North Carolina, having an address for notice of 800 Hempstead Place, Charlotte, North Carolina 28207.

42.     Defendant JWI, LLC ("**JWI**") is a North Carolina limited liability company whose sole member, Jonathon Wylie, upon information and belief, resides at 4111 Tyndale Avenue, Charlotte, North Carolina 28210.

43.     Defendant Robert Plazzo ("**Plazzo**") is an individual who upon information and belief resides at 634 Hampton Road, Wilmington, North Carolina 28409.

6

44. Defendant Gary Fontana ("**Fontana**") is an individual who upon information and belief resides at 221 Tripp Trail, Grimesland, North Carolina 27837.

45. Defendant Mark Boltz ("**Boltz**") is an individual who upon information and belief resides at 404 Montrose Drive, Waxhaw, North Carolina 28173 (Boltz, together with C. Adkison, Riley, Salamone, Carcich, Weatherford, Doyle, Bernard, Frasier, Equity Trust, Leighton, Cowan, Weaver, Blair, JWI, Plazzo, Fontana, P. Harding, Cosper, Scolds and PL-1 the "**Life Insurance Recipients**").

46. Defendant Lift It MSA, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Lift**" together with Rentals, Holdings, Capital, Rentals Two, Rentals Three, Rentals Four, Rentals Five, Rentals Six, Rentals Seven, Rentals Eight, Rentals Nine, Rentals Ten, Rentals XL, Rentals XL Two, Rentals XL Three and Rentals XL Four the "**Borrowers**").

47. Defendant Co-X Holdings, LLC is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**Co-X**").

48. Defendant Lift-It PL-1, LLC, is a Wyoming limited liability company with its principal place of business located at 648 NE Third Ave, Fort Lauderdale, Florida 33304 ("**PL-1**").

49. Defendant Co-X Advisory Group, LLC, is a Florida limited liability company with its principal place of business located at 1112 Flagler Drive, Fort Lauderdale, Florida 33304 ("**Co-X Advisory**") (together with Co-X and PL-1 the "**Affiliates**;" and Affiliates together with Diggs, Adkison, M. Adkison, Jeffcoat, the Equity Owners and the Life Insurance Recipients, the "**Defendants**").

7

50.     Diggs and Adkison are the sole members of all the Borrowers except Rentals and PL-1.   The members of Rentals are Diggs, Adkison and all the Equity Owners.   The members of PL-1 are MSD Legacy Ventures, LLC and PM Adkison, LLC of which, upon information and belief, Diggs and Adkison, respectively, are the only members.

## SUMMARY OF CLAIMS

51.     As discussed in more detail below, the Borrowers, Affiliates, Diggs, Adkison, M. Adkison (manager of assets and operations) and Jeffcoat (controller) (collectively, the "**Co-Conspirators**") engaged in an elaborate fraudulent scheme to defraud federally regulated banking institutions.

52.     The Borrowers had essentially one customer "group."  The name of that customer was Applied Machinery Sales, LLC, Applied Machinery Rentals, LLC and their affiliates (collectively, "**AMR**").  The owner of AMR was Garth Errol McGillewie Jr. ("**Garth**").

53.      Under the Borrowers' loan with the Bank, the Borrowers were required to own assets of substantially more value than the loan balance so that the loan would be fully collateralized at all times.

54.     The Borrowers were supposed to use the loan proceeds from the Bank to purchase construction equipment.  The Co-Conspirators then represented to the Bank that they hired AMR to lease the equipment to third parties.  At all times, the Borrowers and their officers represented to the Bank that the Borrowers owned the equipment and received an income stream from renting the equipment to third parties.

55.     Contrary to these representations, AMR never leased the equipment to third parties.  Instead, AMR and Garth operated an elaborate Ponzi scheme, and the Co-Conspirators knew about, assisted with and benefited from this scheme.

8

56.     The revenues from the Ponzi scheme came from two primary sources.  First, AMR generated revenues from loans with multiple lenders.  AMR falsely represented to these lenders that AMR owned and leased equipment to third parties.  As part of the scheme, AMR would then often pledge the same piece of equipment as collateral to multiple lenders to obtain multiple loans.  AMR deceived each of these lenders into believing that each lender held the only security interest on each piece of equipment.  As a result, AMR improperly collected loan proceeds from duplicative loans on the same collateral.

57.     Even worse, at times AMR obtained multiple loans on equipment which did not exist.  AMR was able to deceive its lenders to issue loans based on a pledge of this non-existent equipment as collateral.

58.     AMR colluded with the Borrowers to multiply the scale of the fraud.  The Borrowers' loan proceeds were funneled through AMR to facilitate additional machine purchases, which in turn scaled up the Ponzi scheme and inflated the improper distributions to the fraudsters.

59.     Second, for an additional revenue source, AMR received revenues from the sale of equipment.  AMR would sell the equipment to third parties without ever disclosing the fact that AMR had given lenders a security interest in the equipment.  That enabled AMR to collect and retain all sale proceeds without discharging any liens or paying a portion of the sale proceeds to its secured lenders.

60.      AMR, Garth and the Co-Conspirators then divided the spoils of the Ponzi scheme among one another.  To cover up the fraud, AMR represented to its lenders that AMR was always collecting rents from third-party lessees based on leases which did not exist. Borrowers represented the same to the Bank.  AMR and Borrowers then used a small portion of

9

their cash hoard to make loan payments. That cleared the way for AMR and the Borrowers to make massive cash distributions to Garth and the Co-Conspirators to fund their lavish personal lifestyles.

61.    Eventually, as is the case with all Ponzi schemes, the new cash coming in from the scheme could not cover the cash going out. AMR was the first to collapse when it defaulted on one of its loans and a lender obtained the appointment of a receiver over all AMR operations.

62.    Immediately after the receiver was appointed over AMR, rather than face up to his fraud, Garth committed suicide.

63.    Thereafter, the dominoes of the scheme rapidly fell. AMR and the Borrowers were placed in bankruptcy in the summer of 2023.

64.    With insatiable greed and no shame, even after the collapse of AMR, the Co-Conspirators continued their fraudulent conduct. For years, the Borrowers paid the premiums on a $5 million life insurance policy ("**Policy**") owned by Rentals which insured the life of Garth for the benefit of Rentals. However, after Garth committed suicide, and knowing full well that Rentals had no assets to pay the Bank on the Loan other than the life insurance proceeds, Borrowers assigned the Policy to PL-1, a non-borrower affiliate, as "collateral" for loans allegedly provided by the Life Insurance Recipients to PL-1. Thereafter, PL-1 recovered the $5 million in life insurance proceeds and then distributed those proceeds to the Life Insurance Recipients even though the insurance proceeds were clearly an asset of Rentals which had been fraudulently conveyed first to PL-1 and then fraudulently conveyed again to the Life Insurance Recipients.

65.     The Defendants have yet to be held accountable for their active fraud and their receipt of at least $40 million in fraudulent conveyances.  In this action, the Bank seeks to hold all the Defendants accountable for this scheme and recover at least $55 million in damages.

## JURISDICTION

66.     This Court has jurisdiction over this civil action under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331(a)(2) because this civil action arises under the laws of the United States and Plaintiffs are alleging causes of action for violation of their rights under Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. §§ 1961 et seq.

67.     This Court also has jurisdiction over all the claims in this matter pursuant to 28 U.S.C. § 1334(b) because the damages in this case exceed $75,000 and there is complete diversity between the Plaintiff and Defendants.

68.     For diversity jurisdiction, the Bank is a citizen of the Commonwealth of Pennsylvania because the Bank is a national banking institution which maintains its corporate headquarters in Pittsburgh, Pennsylvania.

69.     As set forth above, the Defendants are citizens of Wyoming, North Carolina, Georgia, Tennessee, Connecticut or Florida.

70.     Venue is proper in the United States District Court for the Western District of Pennsylvania under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

71.     This action is not a collusive one designed to confer jurisdiction on a court of the United States that such court would not otherwise possess.

## FACTUAL BACKGROUND

**The Loan to the Borrowers**

11

72. On June 8, 2018, the Bank and its loan participants provided a revolving line of credit to the Borrowers ("**Loan**").

73. On November 4, 2020, the Bank and the Borrowers amended and restated the Loan to increase the maximum amount of the revolving Loan to $70 million.

74. The documents evidencing the new Loan terms as of November 4, 2020 include the following documents which are all dated as of November 4, 2020 (i) an Amended and Restated Credit Agreement, a true and accurate copy of which is attached as **Exhibit A** (as amended the "**Credit Agreement**"), (ii) an Amended and Restated Security Agreement, a true and accurate copy of which is attached as **Exhibit B** (as amended, the "**Security Agreement**"), (iii) an Amended and Restated Revolving Credit Note in the original principal amount of $35 million in favor of the Bank, a true and accurate copy of which is attached as **Exhibit C** (as amended, the "**Bank Note**"), (iv) an Amended and Restated Revolving Credit Note in the original principal amount of $17.5 million in favor of the First Merchants Bank ("**Merchants**"), a true and accurate copy of which is attached as **Exhibit D** (as amended, the "**Merchants Note**"), (v) an Amended and Restated Revolving Credit Note in the original principal amount of $8.75 million in favor of Live Oak Banking Company ("**Live Oak**"), a true and accurate copy of which is attached as **Exhibit E** (as amended, the "**Live Oak Note**"), (vi) an Amended and Restated Revolving Credit Note in the original principal amount of $8.75 million in favor of the Israel Discount Bank of New York ("**Israel Bank**" together with the Bank, Merchants and Live Oak the "**Original Lenders**" and the current lenders which consist only of the Bank and Merchants, the "**Lenders**"), a true and accurate copy of which is attached as **Exhibit F** (as amended, the "**Israel Note**" together with the Bank Note, Merchants Note and Live Oak Note the "**Note**").

12

75. Under the Credit Agreement, the Bank is the authorized administrative agent to act on behalf of all the Lenders.

76. Under the Loan, the Borrowers are required to own assets of substantially more value than the balance of the Loan. This was to ensure that the loan was always fully collateralized. The primary assets of the Borrowers were supposed to consist of equipment inventory, leases to third parties and accounts receivable from these third parties.

77. The Borrowers' business was a simple one. AMR was the Borrowers' only customer. AMR owned exclusive distributorship rights for certain high end heavy construction machinery manufactured by Merlo S.p.A. ("**Merlo**"). With Loan proceeds, the Borrowers were supposed to purchase the Merlo equipment through AMR, and AMR was supposed to act as the Borrowers' agent to lease the equipment to third parties on behalf of the Borrowers. In all these transactions, Borrowers were to remain the owners of the equipment and the lessors under the leases. AMR was supposed to collect the rent from the third-party lessees and then pay an agreed portion of that rent to the Borrowers.

78. Under this arrangement, the Bank received a lien on all the Borrowers' accounts receivable, leases, and equipment inventory, including without limitation all Merlo machines.

79. During the term of the Loan, the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat provided borrowing base certificates ("**Borrowing Base Certificates**") and financial records ("**Borrower Financials**") to the Bank in which they represented that at all relevant times, the Borrowers owned equipment and other collateral which was valued well in excess of the Loan balance.

80.     For example, on Borrowing Base Certificates in the first five (5) months of 2023, the Borrowers represented that the Borrowers owned on average equipment which exceeded $60 million in value and accounts receivable which exceeded $10 million in value.

81.     **Exhibit G** is a true and accurate copy of the Borrowing Base Certificate for the month of April 2023 signed by the Borrowers and dated May 3, 2023.  All the Borrowing Base Certificates were in the same format attached as **Exhibit G.**

82.     In each Borrowing Base Certificate, the signatory for the Borrowers stated, "I hereby certify that the above information is true and accurate."  [Ex. G]  The signatory further stated, "Borrower hereby certifies that they are not in default under the Security Agreement or any of Borrower's liabilities."  [Ex. G]

83.     A true and accurate summary of the dates the Borrowers submitted the Borrowing Base Certificates to the Bank and the value of equipment inventory and accounts receivable listed on all these Borrowing Base Certificates from November 2020 through June of 2023 is set forth below.

### Monthly Borrowing Base Certificates Summary

| Date | Inventory Balance | Accounts Receivable |
|---|---|---|
| Nov-20 | $ 46,798,007.09 | $ 3,464,343.90 |
| Dec-20 | $ 46,760,727.73 | $ 2,920,140.44 |
| May-21 | $ 51,379,573.61 | $ 6,342,312.58 |
| Jun-21 | $ 51,379,573.61 | $ 6,845,517.01 |
| Aug-21 | $ 58,151,865.63 | $ 5,651,136.71 |
| Sep-21 | $ 61,029,054.75 | $ 6,458,905.26 |
| Oct-21 | $ 63,429,054.75 | $ 5,811,684.61 |
| Nov-21 | $ 63,429,054.75 | $ 6,785,675.68 |
| Dec-21 | $ 60,523,545.45 | $ 8,677,661.22 |
| Jan-22 | $ 60,523,545.45 | $ 7,734,686.10 |
| Feb-22 | $ 60,705,858.80 | $ 9,268,309.78 |
| Mar-22 | $ 60,716,375.65 | $ 10,332,754.53 |
| Apr-22 | $ 60,797,960.59 | $ 8,845,595.96 |

| May-22 | $ | 63,822,896.42 | $ | 9,794,633.87 |
|---|---|---|---|---|
| Jul-22 | $ | 66,155,773.93 | $ | 9,712,594.36 |
| Aug-22 | $ | 66,155,773.93 | $ | 10,919,505.84 |
| Sep-22 | $ | 65,939,281.49 | $ | 11,465,734.31 |
| Dec-22 | $ | 65,939,281.49 | $ | 11,597,549.04 |
| Mar-23 | $ | 65,939,281.49 | $ | 10,857,526.70 |
| Mar-23 | $ | 65,939,281.49 | $ | 11,738,470.09 |
| Apr-23 | $ | 65,939,281.49 | $ | 12,588,346.03 |

84.     Similarly, on all of the Borrower Financials which the Borrowers provided the Bank from late 2020 through June of 2023 to prove compliance with all loan covenants and the borrowing base, the Borrowers represented and warranted that they owned tens of millions of dollars in equipment inventory and were owed substantial accounts receivable related to rental payments from third-party leases arranged by AMR.

85.     For example, Borrowers provided the Bank with Borrower Financials dated April 2023, a true and accurate copy of which is attached as **Exhibit H**, in which the Borrowers represented and warranted that the Borrowers owned equipment "in the field" valued at $56,496,982.

86.     A true and accurate summary of the dates the Borrowers provided the Borrower Financials to the Bank and the value of equipment inventory on all these financials from late 2020 through June of 2023 is set forth below.

| Equipment Value and Accounts Receivable by Month (Financials) | | | | |
|---|---|---|---|---|
| Date | Equipment Value | | Accounts Receivable | |
| Nov-20 | $ | 45,689,052.65 | $ | 2,892,596.11 |
| Dec-20 | $ | 45,885,465.31 | $ | 3,146,013.23 |
| Jan-21 | $ | 46,738,660.13 | $ | 3,510,300.69 |
| Feb-21 | $ | 50,788,154.68 | $ | 3,745,310.25 |
| Mar-21 | $ | 50,587,505.42 | $ | 4,481,428.75 |
| Apr-21 | $ | 50,507,093.76 | $ | 5,393,904.35 |
| May-21 | $ | 50,426,682.10 | $ | 6,298,008.02 |
| Jun-21 | $ | 50,346,270.44 | $ | 4,929,752.09 |

| | | | |
|---|---|---|---|
| Jul-21 | $ 54,930,248.23 | $ 5,189,841.80 |
| Aug-21 | $ 55,846,037.17 | $ 5,935,598.85 |
| Sep-21 | $ 56,866,869.99 | $ 5,493,265.10 |
| Oct-21 | $ 61,974,997.49 | $ 6,785,675.68 |
| Nov-21 | $ 61,861,655.19 | $ 7,009,047.31 |
| Dec-21 | $ 61,473,413.56 | $ 6,115,970.19 |
| Jan-22 | $ 60,760,424.42 | $ 8,176,117.89 |
| Feb-22 | $ 60,396,849.39 | $ 9,515,199.78 |
| Mar-22 | $ 60,254,838.17 | $ 9,800,131.75 |
| Apr-22 | $ 60,227,063.07 | $ 9,345,786.13 |
| May-22 | $ 59,826,459.89 | $ 10,022,366.27 |
| Jun-22 | $ 60,013,486.09 | $ 9,410,097.14 |
| Jul-22 | $ 62,581,541.12 | $ 10,142,662.82 |
| Aug-22 | $ 62,115,140.44 | $ 11,167,337.26 |
| Sep-22 | $ 61,657,676.08 | $ 8,776,561.23 |
| Oct-22 | $ 61,452,084.23 | $ 10,264,634.12 |
| Nov-22 | $ 60,905,488.06 | $ 11,394,805.85 |
| Dec-22 | $ 60,354,878.15 | $ 11,957,774.82 |
| Jan-23 | $ 59,441,261.53 | $ 12,499,802.86 |
| Feb-23 | $ 58,468,438.00 | $ 10,732,678.80 |
| Mar-23 | $ 57,484,314.70 | $ 12,133,422.19 |
| Apr-23 | $ 56,496,981.83 | $ 13,134,167.18 |

**The Ponzi Scheme of AMR**

87.    Garth was the sole owner of AMR.  AMR purported to be in the business of acquiring, distributing, leasing, and selling Merlo telehandlers.  Merlo telehandlers are Italian made hydraulic machines that are a combination tractor, forklift, and crane boom. AMR was the exclusive dealer for Merlo equipment in North America.

88.    Garth ran AMR as a criminal enterprise with the intent to enrich himself and the Co-Conspirators at the expense of creditors.

89.    AMR operated a classic Ponzi scheme which had two primary sources of funds. First, AMR obtained loans and other purchase financing by fraud.  AMR represented to its lenders

that AMR owned and leased equipment to third parties.   AMR pledged equipment, leases and/or accounts receivable as collateral for loans.

90.   In fact, AMR pledged the same equipment to multiple lenders promising each a first priority lien on the equipment.  That enabled AMR to multiply the number of loans it could obtain on each piece of collateral.   Even worse, at times AMR pledged as collateral equipment which did not even exist, and the lenders were duped into issuing loans secured by this non-existent equipment.

91.   For example, below is a chart from June of 2023 which reveals how many parties purportedly had competing claims or interests to the same equipment AMR claimed to have owned, when in fact AMR had already sold most of its equipment to third-party buyers:

| Serial Number | Model | Lift It | FNB | Bigge Crane CEF | Park Bros. | MacAllister Machinery | Professional Equipment Rentals | NFS | Apex Funding Source, LLC | Fusion Funding | Square Funding, LLC | VFI | Woodforest |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZF1RT21D1D2001490 | ROTO50.26SPLUSEE4 | | | x | | | | | x | x | x | x | x |
| ZF1RT30D1D1000047 | ROTO50.35SPLUSEE4-CVTRONIC | | | x | x | | | x | x | x | x | x | x |
| ZF1RT30D1D1001963 | ROTO70.24SPLUSEE4 | x | | x | | | | | x | x | x | x | x |
| ZF1RT30D1D2001232 | ROTO50.35SPLUSEE4-CVTRONIC | x | X | x | | x | | x | x | x | x | x | x |
| ZF1RT30D1D2001605 | ROTO50.30SPLUSEE4 | | | x | | | | x | x | x | x | x | x |
| ZF1RT30D1D2001628 | ROTO50.30SPLUSEE4 | | | x | | | | x | x | x | x | x | x |
| ZF1RT30D1D2001926 | ROTO50.35SPLUSEE4-CVTRONIC | x | X | x | | x | x | x | x | x | x | x | x |
| ZF1RT30D1D2002093 | ROTO70.28SPLUSEE4-CVTRONIC | | | x | | | | | x | x | x | x | x |
| ZF1RT30D1D2002095 | ROTO50.35SPLUSEE4-CVTRONIC | | | x | | | | x | x | x | x | x | x |

92.    As a second source of revenue, AMR sold the equipment "out of trust" to third parties without the lenders' knowledge or consent, and without remitting the sale proceeds to the lenders.

93.   Garth and other employees of AMR utilized multiple strategies to deceive and hide their fraud from customers and lenders. These deceptive strategies included the following:

a. AMR would generate fake bills of lading to hide that machines were never delivered or to hide the facts that a machine other than the one purchased was delivered. One former AMR employee was recorded on audio in 2018 admitting the elaborate fraudulent scheme and stated the following: "Yeah, I mean, I just, I told them that you know, I couldn't do it anymore. And he was like, well, I'll change, you know, it, we'll get this on track, we'll, we'll start doing it right, da da dada. Yeah, and I was like I'm not wasting my time to see if this will change like I'm not taking that chance and missing an opportunity that I have, even though this [expletive] opportunity was ridiculous, but it was better than being somewhere that they were asking me to do [expletive], like, I don't know how many different bill of lading that we had to forge signatures on so it so it looked like those items had been delivered to the customer."

b. Another AMR employee admitted the fraud on audiotape and stated with respect to Garth: "So, because he was, you know, making fraudulent orders and just creating these invoices to make it look like he had revenue coming in, he had to have this bill of bill of lading to prove that he could recognize that revenue, so he made all these bill of ladings and had you know, Jessica and Hillary and all the guys in the, I told him I was like, I'm not doing this. You can ask everybody else, but I'm not. My name's not going on this thing. And they would just have, they would just forge random name signatures showing that it was quote unquote delivered."

c. AMR routinely switched serial numbers on machines or shipped machines other than the one purchased. AMR even utilized blank serial number plates to create new numbers for machines that were shipped from Merlo with a different serial

number. AMR engaged in these fraudulent practices so often that AMR employees used the phrase "switcharoos" to describe the changes.

d.     AMR routinely changed serial numbers on invoices.   At one point, one AMR employee admitted the fraud on audiotape and stated: "From here on out, we shouldn't be switching serial numbers. We will be trying to give our customers the machines on their invoices by cherry picking from the port. It won't always be possible, but we will try because editing of invoices & playing musical machines in the shop is getting way too confusing & frustrating for all, so we all want to simplify this process. I know it still may happen on occasions, especially if the customer is screaming, but we will really try to avoid this if we can."

**The Co-Conspirators Participate in the Fraudulent Scheme**

94.     AMR colluded with the Co-Conspirators.  The Co-Conspirators knew about the intimate details of the AMR Ponzi scheme.  In fact, the whole purpose of the Borrowers' operation was to increase the scale of the Ponzi scheme through the Loan proceeds from the Bank.  AMR and the Borrowers used the Loan proceeds to fund the purchase of machines and pay officers and employees to assist with the fraud.  AMR and the Borrowers also used the Loan proceeds to make payments to lenders of AMR and the Borrowers to lull these lenders into a false sense of security that they held performing loans with real collateral.  The increased scale of the Ponzi scheme enabled the fraudsters to make more illicit distributions to themselves at the expense of the Bank and other lenders.

95.     Once proceeds from the Ponzi scheme were distributed to Borrowers by AMR or the Bank, the Borrowers made debt service payments and covered other business expenses.  The Borrowers then made massive distributions to the Equity Owners and paid massive fees to the

Affiliates for services never provided or not needed.  By 2023, the Borrowers made tens of millions

of dollars in distributions to the Equity Owners and made millions of dollars in payments to the

Affiliates.

96.    A true and accurate summary of the pattern of Loan borrowing and distributions to

the Equity Owners is set forth below.

| Owner Distributions and Loan Advances by Month | | |
|---|---|---|
| **Date** | **Owner Distributions** | **Loan Advance** |
| Nov-20 | $ 130,870.00 | $ 5,353,262.58 |
| Dec-20 | $ - | $ 1,650,000.00 |
| Jan-21 | $ 110,000.00 | $ 925,000.00 |
| Feb-21 | $ 445,858.24 | $ 4,783,506.62 |
| Mar-21 | $ 19,643.44 | $ 150,000.00 |
| Apr-21 | $ - | $ 1,725,000.00 |
| May-21 | $ 1,500,000.02 | $ 150,000.00 |
| Jun-21 | $ - | $ 150,000.00 |
| Jul-21 | $ 2,200,001.00 | $ 7,422,176.41 |
| Aug-21 | $ - | $ 2,868,342.80 |
| Sep-21 | $ - | $ 325,000.00 |
| Oct-21 | $ 4,056,715.95 | $ 9,333,905.11 |
| Nov-21 | $ - | $ 350,000.00 |
| Dec-21 | $ - | $ 450,000.00 |
| Jan-22 | $ 89,912.64 | $ - |
| Feb-22 | $ - | $ - |
| Mar-22 | $ 31,180.00 | $ 700,000.00 |
| Apr-22 | $ 1,950,000.00 | $ 2,450,000.00 |
| May-22 | $ 28,634.28 | $ 750,000.00 |
| Jun-22 | $ - | $ 200,000.00 |
| Jul-22 | $ 3,000,000.00 | $ 6,322,478.82 |
| Aug-22 | $ - | $ 325,000.00 |
| Sep-22 | $ - | $ 250,000.00 |
| Oct-22 | $ 5,000,000.00 | $ 5,300,000.00 |
| Nov-22 | $ 500,771.55 | $ 275,000.00 |
| Dec-22 | $ - | $ 500,000.00 |
| Jan-23 | $ - | $ 100,000.00 |
| Feb-23 | $ - | $ 200,000.00 |
| Mar-23 | $ 60,156.18 | $ 550,000.00 |
| Apr-23 | $ 2,200,000.01 | $ 2,450,000.00 |

| May-23 | $ | - | $ | 300,000.00 |
| Jun-23 | $ | - | $ | 375,000.00 |
| Jul-23 | $ | - | $ | - |

97.	Garth, Diggs and Adkison lived lavish personal lifestyles with their ill-gotten gains.

98.	The Co-Conspirators intentionally deceived the Bank in multiple ways. For example, the Co-Conspirators at various times represented to the Bank that from the inception of the Loan through June of 2023 that the Borrowers owned equipment, leases and receivables far in excess of the balance of the Loan.

99.	In fact, the Co-Conspirators knew that the Borrowers did not ever own any equipment and were not the lessor under any valid leases for Merlo machines.

100.	The Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat clearly knew that Borrowers never owned any equipment, as is evidenced by the fact that they never even tried to track the location or possession of the tens of millions of dollars' worth of equipment which they purportedly owned. They always knew that such tracking would be futile. Furthermore, they knew any tracking would need to be turned over to the Bank's field examiner and the field examiner would have discovered the fraud immediately.

101.	The greed of the Co-Conspirators was shameless. For example, under the Loan Documents, the Bank prohibited the financing of any equipment unless that equipment was physically located in the United States. Undaunted, the Co-Conspirators funneled Loan and other cash proceeds to Rentals and then Rentals "loaned" that cash to PL-1. PL-1 then financed AMR's purchase of machines which were physically located outside the United States in order to further scale up the fraudulent scheme. With more machines came more duplicative financings and more "out of trust" machine sales. That produced more illicit distributions to the Co-Conspirators.

21

102.    To prevent the Bank from discovering the fraud, the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat:

(a)    Neither kept nor sought documents or other proof evidencing the Borrowers' ownership of the equipment; instead, relying on Excel spreadsheets generated by AMR to cover over the fraud.

(b)    Neither kept nor sought to develop a list of all the end user lessees.

(c)    Neither kept nor sought to obtain copies of the alleged leases to third-party lessees.

(d)    Neither kept nor sought to obtain accounting records to determine how lease payments were applied, especially when only partial payments were made.

(e)    Never attached GPS devices to monitor the locations of the equipment.

(f)    Never obtained proof of insurance by the third-party lessees.

(g)    Never disclosed that Rentals transferred Loan proceeds to PL-1 which in turn bought machines located outside the United States for the benefit of AMR when such purchases were prohibited under the Loan Documents.

(h)    Never received payments from AMR directly tied to any specific invoice or rental payments.  In fact, AMR made irregular and sporadic payments to Borrowers in large round numbers.   *See* **Exhibit I**, which contains a summary of wire transfers made between the Borrowers and AMR.

103.    Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat made misrepresentations of fact to the Bank multiple times throughout 2020 through June of 2023, including without limitation the following false statements:

    (a)    The Borrowing Base Certificates and Borrowers Financials were accurate.

    (b)    The Borrowers owned tens of millions of dollars of equipment inventory.

    (c)    The Borrowers were owed millions of dollars of accounts receivable on account of third-party equipment leases under which Borrowers were lessor.

    (d)    The Borrowers had properly tracked and accounted for all their equipment inventory.

    (e)    The Borrowers complied with their borrowing base requirements under the Loan.

    (f)    The Loan was not in default.

104.    Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat fraudulently concealed facts from the Bank at multiple times from 2020 through June of 2023 including without limitation the following:

    (a)    The Borrowing Base Certificates and Borrowers Financials were inaccurate.

    (b)    The Borrowers did not own any equipment inventory.

    (c)    The Borrowers were not lessors due millions of dollars of accounts receivable on account of third-party equipment leases under which Borrowers were lessor.

    (d)    The Borrowers had not properly tracked and accounted for all their equipment inventory.

(e)    The Borrowers were never in compliance with the borrowing base requirements under the Loan.

(f)    The Loan was in default.

105.    Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat provided the Bank with false financial records including, without limitation, the records summarized in the tables above.

106.    As a result of the fraud perpetrated upon the Bank, the Lenders have suffered damages in an amount to be determined at trial but which upon information and belief exceeds $55 million.

**The Collapse of The Fraudulent Scheme and the Life Insurance Fraud**

107.    The fraudulent scheme collapsed in June of 2023.  As is true of all Ponzi schemes, cash inflows gradually became insufficient to cover cash outflows.  The insufficiency of the cash inflows to cover cash outflows then grew at an accelerated pace into a snowball effect until the entire scheme collapsed.

108.    On June 18, 2023, after AMR defaulted on a loan with one of its largest creditors, a court appointed a receiver over AMR.

109.    On June 21, 2023,  Garth committed suicide rather than face justice for his actions.

110.    In one final series of fraudulent acts, the Co-Conspirators took steps to ensure that they could strip more assets out of the Borrowers at the expense of the  Bank.

111.    For years, Rentals paid the life insurance premiums on the $5 million Policy which insured the life of Garth for the benefit of Rentals.  After Garth died, the Policy was the only valuable asset owned by Rentals.   Despite the fact that the Co-Conspirators knew the Bank had no collateral other than the Policy, the Co-Conspirators assigned the Policy to PL-1 after the death

24

of Garth, collected the $5 million in insurance proceeds and distributed all the proceeds from the policy to the Life Insurance Recipients.

112.    On July 17, 2023, AMR was placed in bankruptcy in the United States Bankruptcy Court for the Western District of North Carolina under Case number 23-30461.

113.    On July 11, 2023, the Lenders filed involuntary bankruptcy petitions with respect to the Borrowers in the United States Bankruptcy Court for the Eastern District of North Carolina under case number 01936-5-DMW.  On October 1, 2024, that bankruptcy case was dismissed.

114.    Borrowers have not made a loan payment to the Bank since June of 2023.

115.    The Bank learned of the scheme for the first time in June of 2023.

### COUNT I:  FRAUDULENT MISREPRESENTATIONS
**(Against Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat)**

116.    The Bank repeats and realleges all prior allegations.

117.    At all relevant times, Diggs, Adkison, M. Adkison and Jeffcoat were the most senior officers and directors of Borrowers who were primarily responsible for Borrowers' operations.

118.    The Co-Conspirators orchestrated, and were the beneficiaries of, a massive fraudulent scheme to misrepresent and conceal information from the Bank.

119.    The Co-Conspirators knew that Borrowers did not own any equipment inventory or legitimate accounts receivable attributable to third-party equipment leases.  Despite this, the Co-Conspirators manufactured false business records to give the appearance to the Bank that Borrowers owned millions of dollars in equipment inventory, leases and accounts receivable.  This induced the Bank to make advances on the Loan and not seek to enforce its rights and remedies with respect to the Loan.

120.    The Co-Conspirators knew that Borrowers never owned any equipment, equipment leases or receivables and hid that fact from the Bank.  The Borrowers, Diggs, Adkison, M. Adkison

and Jeffcoat never obtained documents establishing ownership of the equipment. The Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat never even tried to track the location or possession of the equipment which they purportedly owned. They always knew that such tracking would be futile and should be avoided because it would create a paper trail evidencing the fraud.

121. The Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat used deficient recordkeeping and other deceptive strategies to prevent the Bank from uncovering the fraud. For example, the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat:

(a) Neither kept nor sought documents or other proof evidencing the Borrowers' ownership of the equipment; instead, relying on Excel spreadsheets generated by AMR to cover over the fraud.

(b) Neither kept nor sought to develop a list of all the end user lessees.

(c) Neither kept nor sought to obtain copies of the alleged leases to third-party lessees.

(d) Neither kept nor sought to obtain accounting records to determine how lease payments were applied, especially when only partial payments were made.

(e) Never attached GPS devices to monitor the locations of the equipment.

(f) Never obtained proof of insurance by the third-party lessees.

(g) Never disclosed that Rentals transferred Loan proceeds to PL-1 which in turn bought machines located outside the United States for the benefit of AMR when such purchases were prohibited under the Loan Documents.

(h) Never received payments from AMR directly tied to any specific invoice or rental payments.

26

122.   In fact, AMR made irregular and sporadic payments to Borrowers in large round numbers. *See* **Exhibit I**, which contains a summary of wire transfers made between the Borrowers and AMR. Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat made the following misrepresentations of fact to Bank multiple times throughout 2020 through June of 2023, including without limitation the following:

(a)   The Borrowing Base Certificates and Borrowers Financials were accurate.

(b)   The Borrowers owned tens of millions of dollars in equipment inventory.

(c)   The Borrowers were owed millions of dollars of accounts receivable on account of third-party equipment leases under which Borrowers were lessor.

(d)   The Borrowers had properly tracked and accounted for all their equipment inventory.

(e)   The Borrowers complied with their borrowing base requirements under the Loan.

(f)   The Loan was not in default.

123.   Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat fraudulently concealed from the Plaintiff the following facts at multiple times from 2020 through June of 2023 including without limitation the following:

(a)   The Borrowing Base Certificates and Borrowers Financials were inaccurate.

(b)   The Borrowers did not own any equipment inventory.

(c)   The Borrowers were not lessors due millions of dollars of accounts receivable on account of third-party equipment leases under which Borrowers were lessor.

27

(d)    The Borrowers had not properly tracked and accounted for all their equipment inventory.

(e)    The Borrowers were never in compliance with the borrowing base requirements under the Loan.

(f)    The Loan was in default.

124.    Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat provided the Bank with false financial records including without limitation the records summarized in the tables above.

125.    At the time that the Co-Conspirators made their material misrepresentations to Bank, the Co-Conspirators knew that the representations they made to the Bank were false and misleading.

126.    At the time that the Co-Conspirators concealed material information from the Bank, the Co-Conspirators knew their concealment was false and misleading.

127.    The Co-Conspirators made their misrepresentations and concealed information to induce the Bank to make advances on the Loan.

128.    The Bank justifiably relied upon the misrepresentations and the concealment of information to the Bank's detriment. But for the misrepresentations and concealment of facts, the Bank never would have made any advances on the Loan to the Borrowers and would have acted to enforce rights and remedies before incurring losses.

129.    As a direct and proximate result of the fraudulent conduct of the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat, the Bank has suffered more than $55 million in damages plus interest, legal fees, and costs.

130.    The fraudulent misrepresentations and fraudulent concealment of facts by the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat were outrageous, willful, wanton, and with

a conscious disregard of the rights of others.  Accordingly, Plaintiff is entitled to punitive damages.

### COUNT II:  FRAUDULENT CONCEALMENT
**(Against Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat)**

131.    The Bank repeats and realleges all prior allegations.

132.    At all relevant times, Diggs, Adkison, M. Adkison and Jeffcoat were the most senior officers and directors of Borrowers who were primarily responsible for Borrowers' operations.

133.    The Co-Conspirators orchestrated, and were the beneficiaries of, a massive fraudulent scheme to misrepresent and conceal information from the Bank.

134.    The Co-Conspirators knew that Borrowers did not own any equipment inventory or legitimate accounts receivable attributable to third-party equipment leases.  Despite this, the Co-Conspirators manufactured false business records to give the appearance to the Bank that Borrowers owned millions of dollars in equipment inventory, leases and accounts receivable. This induced the Bank to make advances on the Loan and not seek to enforce its rights and remedies with respect to the Loan.

135.    The Co-Conspirators knew that Borrowers never owned any equipment, equipment leases or receivables and hid that fact from the Bank.  The Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat never obtained documents establishing ownership of the equipment.   The Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat never even tried to track the location or possession of the equipment which they purportedly owned.  They always knew that such tracking would be futile and should be avoided because it would create a paper trail evidencing the fraud.

136.  The Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat used deficient recordkeeping and other deceptive strategies to prevent the Bank from uncovering the fraud.  For example, the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat:

(a)    Neither kept nor sought documents or other proof evidencing the Borrowers' ownership of the equipment; instead, relying on Excel spreadsheets generated by AMR to cover over the fraud.

(b)    Neither kept nor sought to develop a list of all the end user lessees.

(c)    Neither kept nor sought to obtain copies of the alleged leases to third-party lessees.

(d)    Neither kept nor sought to obtain accounting records to determine how lease payments were applied, especially when only partial payments were made.

(e)    Never attached GPS devices to monitor the locations of the equipment.

(f)    Never obtained proof of insurance by the third-party lessees.

(g)    Never disclosed that Rentals transferred Loan proceeds to PL-1 which in turn bought machines located outside the United States for the benefit of AMR when such purchases were prohibited under the Loan Documents.

(h)    Never received payments from AMR directly tied to any specific invoice or rental payments. In fact, AMR made irregular and sporadic payments to Borrowers in large round numbers. *See* **Exhibit I**, which contains a summary of wire transfers made between the Borrowers and AMR.

137.    Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat made the following misrepresentations of fact to Bank multiple times throughout 2020 through June of 2023, including without limitation the following:

(a)    The Borrowing Base Certificates and Borrowers Financials were accurate.

(b)    The Borrowers owned tens of millions of dollars in equipment inventory.

30

(c)    The Borrowers were owed millions of dollars of accounts receivable on account of third-party equipment leases under which Borrowers were lessor.

(d)    The Borrowers had properly tracked and accounted for all their equipment inventory.

(e)    The Borrowers complied with their borrowing base requirements under the Loan.

(f)    The Loan was not in default.

138. Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat fraudulently concealed from the Plaintiff the following facts at multiple times from 2020 through June of 2023 including without limitation the following:

(a)    The Borrowing Base Certificates and Borrowers Financials were inaccurate.

(b)    The Borrowers did not own any equipment inventory.

(c)    The Borrowers were not lessors due millions of dollars of accounts receivable on account of third-party equipment leases under which Borrowers were lessor.

(d)    The Borrowers had not properly tracked and accounted for all their equipment inventory.

(e)    The Borrowers were never in compliance with the borrowing base requirements under the Loan.

(f)    The Loan was in default.

139. Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat provided the Bank with false financial records including without limitation the records summarized in the tables above.

140.   At the time that the Co-Conspirators made their material misrepresentations to Bank, the Co-Conspirators knew that the representations they made to the Bank were false and misleading.

141.   At the time that the Co-Conspirators concealed material information from the Bank, the Co-Conspirators knew their concealment was false and misleading.

142.   The Co-Conspirators made their misrepresentations and concealed information to induce the Bank to make advances on the Loan.

143.   The Bank justifiably relied upon the misrepresentations and the concealment of information to the Bank's  detriment.  But for the misrepresentations and concealment of facts, the Bank never would have made any advances on the Loan to the Borrowers and would have acted to enforce rights and remedies before incurring losses.

144.   As a direct and proximate result of the fraudulent conduct of the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat, the Bank have suffered more than $55 million in damages plus interest, legal fees, and costs.

145.   The fraudulent misrepresentations and fraudulent concealment of facts by the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat were outrageous, willful, wanton, and with a conscious disregard of the rights of others.  Accordingly, Plaintiff is entitled to punitive damages.

## COUNT III:  NEGLIGENT MISREPRESENTATION
**(Against Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat)**

146.   The Bank repeats and realleges all prior allegations.

147.   As set forth above, the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat orchestrated a fraudulent scheme against the Bank.

148.    In the alternative, to the extent that the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat prove that they did not know that their representations were false at the time they were made or their concealment of facts was misleading, Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat should have known that their representations and omissions were false and misleading and/or these Defendants acted with reckless disregard for the truth.

149.    Among other things, there is simply no conceivable way that the excessive returns on investment could have been achieved by the Borrowers absent some kind of fraudulent scheme.

150.    The Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat had a duty to provide accurate information to the Bank.

151.    The Bank relied on the misrepresentations and omissions of the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat when the Bank made advances under the Loan and refrained from declaring a default and enforcing rights and remedies.

152.    The Bank justifiably relied upon the negligent misrepresentations and omissions of the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat.  But for those negligent misrepresentations and omissions, the Bank never would have made advances under the Loan or refrained from enforcing rights and remedies.

153.    As a direct and proximate result of the fraudulent conduct by the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat, the Bank has suffered more than $55 million in damages plus legal fees and costs.

**COUNT IV:  VIOLATION OF RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1961 *et seq.*)**
**(Against Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat)**

154.    The Bank repeats and realleges all prior allegations.

155. The Co-Conspirators and AMR were and are an enterprise engaged in activities which affect interstate commerce.

156. Diggs, Adkison, M. Adkison and Jeffcoat are persons within the meaning of 18 U.S.C. § 1961(3) and, as persons employed by or associated with the Borrowers, conducted and participated, directly and indirectly, in the conduct of affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

157. From at least June of 2018 and continuing through June of 2023, as a necessary component of the execution of a scheme to obtain funds from the Bank and siphon those funds for their own benefit, the Borrowers, Affiliates, Diggs, Adkison and Jeffcoat conducted or participated, directly or indirectly in the conduct of the enterprises' affairs through a pattern of racketeering activity including (but not limited to) multiple instances of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

158. The Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat engaged in mail fraud in violation of 18 U.S.C. § 1341 by using the mail to make false, fraudulent, and misleading representations (or cause them to be made) to execute their scheme to siphon funds from the various enterprises they controlled.  In particular:

(a)     From June 8, 2018 through June of 2023, the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat used the mail to negotiate, finalize, and close contractual arrangements with the Bank.

(b)     From June 8, 2018 through June of 2023, the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat used the mail to send the Bank false financial information, false Borrower Financials and false Borrowing Base Certificates.

159. The Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat made these false, fraudulent, or misleading statements (or caused them to be made) with the intent to defraud and to execute their scheme to siphon money from the enterprises that they controlled.

160. The Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat knowingly used federally regulated mails for the purpose of executing their scheme and artifice to siphon money from the enterprises that they controlled.

161. The use of the federally regulated mails was essential and/or incident to essential parts of the scheme and artifice to siphon money from the enterprises that the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat controlled.

162. The Borrowers Diggs, Adkison, M. Adkison and Jeffcoat engaged in wire fraud in violation of 18 U.S.C. § 1343 by using wire transfers to make false, fraudulent and/or misleading representations (or cause them to be made) in order to execute their scheme to siphon money from the enterprises that they controlled.  In particular:

    (a)    From June 8, 2018 through June of 2023, the Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat used wire payments to send and receive payments with AMR as part of their fraudulent scheme. Some of these wire transfers are summarized in the attached **Exhibit I**.

163. The Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat made these false, fraudulent, or misleading statements (or caused them to be made) with the intent to execute their scheme to siphon money from the enterprises that they controlled.

164. The Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat knowingly used federally regulated wire communications for the purpose of executing their scheme and artifice to execute their scheme to siphon money from the enterprises that they controlled.

165. The use of the federally regulated interstate wire communications was essential and/or incident to essential parts of the scheme and artifice to execute their scheme to siphon money from the enterprises that they controlled.

166. The acts of racketeering were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

167. The acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

168. The Loan proceeds that Borrowers obtained by virtue of the pattern of racketeering activities by the Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat were used to perpetuate their fraudulent scheme and allowed Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat to execute their overall scheme to siphon money from the enterprises that they controlled, all of which caused injury to the Bank.

169. The Bank was, proximately, and directly injured in its business and property. In particular, Bank lost more than $55 million that it would not have otherwise lost but for the pattern of racketeering activities by the Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat.

**COUNT V: CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(d))**
**(Against the Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat)**

170. The Bank repeats and realleges all prior allegations.

171. The Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat agreed and conspired to conduct their affairs through a pattern of racketeering activities consisting of multiple acts of mail fraud and wire fraud, which activities violate 18 U.S.C. § 1962(c).

172. The Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat knew the general nature of the conspiracy.

173. By agreeing to conduct the affairs of the Borrowers through a pattern of racketeering activities, including multiple acts of mail fraud and wire fraud in violation of 18 U.S.C. § 1962(c), the Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat conspired to violate 18 U.S.C. § 1962(c), which conduct violates 18 U.S.C. § 1962(d).

174. The Bank was injured by reason of the violation of 18 U.S.C.A. § 1962(d), in that, as a direct and proximate result of the conspiracy to violate 18 U.S.C. § 1962(c), the Bank suffered substantial monetary damages.

### COUNT VI:  BREACH OF FIDUCIARY DUTIES
**(Against Diggs, Adkison, M. Adkison and Jeffcoat)**

175. The Bank repeats and realleges all prior allegations.

176. By virtue of their respective positions, Diggs, Adkison, M. Adkison and Jeffcoat owed fiduciary duties to the Bank.  Diggs, Adkison, M. Adkison and Jeffcoat owed the Bank the highest obligation of good faith, fair dealing, loyalty, and due care.

177. Diggs, Adkison, M. Adkison and Jeffcoat breached their duties of loyalty by improperly using, diverting, and/or misappropriating the assets of Borrowers for their own personal benefit and use.

178. Diggs, Adkison, M. Adkison and Jeffcoat breached their fiduciary duty of care, reasonable inquiry, oversight, good faith, and supervision.

179. In particular, Diggs, Adkison, M. Adkison and Jeffcoat completely abdicated their fiduciary duties by failing to implement internal financial controls and/or otherwise inform themselves of Borrowers' activities and financial condition.  The diversion and misappropriation of Borrowers' assets would have been prevented if Diggs, Adkison, M. Adkison and Jeffcoat had exercised, in good faith, prudent business judgment to protect and promote Borrowers' corporate interests.

180.   As a direct and proximate result of Diggs, Adkison, M. Adkison and Jeffcoat's failure to perform their fiduciary duties, the Bank suffered significant damages.  Diggs, Adkison, M. Adkison and Jeffcoat are therefore liable to the Bank.

## COUNT VII:  BREACH OF CONTRACT
### (Against Borrowers Only)

181.   The Bank repeats and realleges all prior allegations.

182.   The Note, Security Agreement and Credit Agreement are lawful and binding contracts between and among the Bank and the Borrowers.

183.   Borrowers breached the Note, Security Agreement and Credit Agreement by failing to make any Loan payments after June of 2023 and failing to always maintain the required borrowing base.

184.   The Bank has suffered damages because of the Borrowers' breach of the Note, Security Agreement and Credit Agreement in an amount which exceeds $55 million.

## COUNT VIII:  AIDING AND ABETTING A FRAUD
### (Against Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat)

185.   The Bank repeats and realleges all prior allegations.

186.   Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat  defrauded the Bank.

187.   Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat knew of the fraud being perpetrated against the Bank by one another and knew of the fraudulent activities of AMR and Garth.

188.   Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat participated in the fraud being perpetrated against the Bank by one another.

189. Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat acted in concert with one another and/or with AMR and Garth.

190. Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat acted pursuant with a common design with one another and/or with AMR and Garth.

191. Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat knew that one another's conduct constitutes a breach of duty and gave substantial assistance or encouragement to one another.

192. Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat knew that the conduct of AMR and Garth constitutes a breach of duty and gave substantial assistance or encouragement to AMR and Garth.

193. The conduct of Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat separately considered constitutes a breach of duty to the Bank.

194. As a direct and proximate result of this conduct, the Bank suffered significant damages. Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat are therefore liable to the Bank in the amount of at least $55 million.

### COUNT IX:  CONSPIRACY TO COMMIT FRAUD
### (Against Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat)

195. The Bank repeats and realleges all prior allegations.

196. Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat committed a fraud against the Bank.

197. Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat conspired together to commit the fraud against the Bank.

198. Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat entered into one or more agreements with one another to commit their fraud.

199. Each of Borrowers, Affiliates, Diggs, Adkison, M. Adkison and Jeffcoat acted in furtherance of the conspiracy.

200. As a direct and proximate result of this conspiracy, the Bank suffered damages exceeding $55 million.

## COUNT X: FRAUDULENT CONVEYANCE (ACTUAL FRAUD)
### (Against all Defendants Except the Life Insurance Recipients)

201. The Bank repeats and realleges all prior allegations.

202. Each payment made by Borrowers to the Equity Owners and Affiliates was a "transfer" under applicable Pennsylvania, North Carolina and Florida (each a "Transfer" and collectively the "Transfers").

203. Each of the Transfers was a transfer of property, or of an interest in property, of the Borrowers and from the Borrowers to the Equity Owners and Affiliates.

204. As set forth herein, in exchange for each of the Transfers, the Borrowers did not receive reasonably equivalent value or consideration for the Transfers.

205. Each of the Transfers was made with actual intent to hinder, delay, or defraud any entity to which the Borrowers was or became indebted, on or after the date that such Transfer was made, or such obligation incurred.

206. Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to 12 Pa. C.S. § 5104, N.C.A.C. § 39-23.4 and 726 Fla. Stat. §105 as applicable.

207. The Equity Owners and Affiliates have not returned the Transfers (or the monetary equivalent thereof).

## COUNT XI: FRAUDULENT CONVEYANCE (CONSTRUCTIVE FRAUD)
### (Against all Defendants Except the Life insurance Recipients)

208. The Bank repeats and realleges all prior allegations.

209. Each of the Transfers was a transfer of property of the Borrowers to the Equity Owners and Affiliates, and each such Transfer constitutes a "transfer" within the meaning of Pennsylvania, North Carolina and Florida, as applicable.

210. At the time of each of the Transfers, the Borrowers were either insolvent or were rendered insolvent because of each Transfer.

211. The total of the Borrowers' debts has been, and continues to be, greater than its available assets.

212. For the reasons set forth herein, in exchange for each of the Transfers, the Borrowers did not receive reasonably equivalent value or consideration.

213. Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to 12 Pa.C.S. § 5105, N.C.A.C. § 39-23.5 and 726 Fla. Stat. §106 as applicable.

214. Defendants have not returned the Transfers (or the monetary equivalent thereof).

## COUNT XII: FRAUDULENT CONVEYANCE (ACTUAL FRAUD)
### (Against the Life Insurance Recipients)

215. The Bank repeats and realleges all prior allegations.

216. Rentals paid for the Policy and the Policy was an asset of Rentals.

217. After the death of Garth, the Co-Conspirators knew that the only material asset owned by any of the Borrowers was the Policy.

218. After the death of Garth, the Co-Conspirators devised a plan to strip the Policy out of Rentals and out of the reach of any collection efforts by the Bank.

219. As part of this scheme, the Co-Conspirators assigned the Policy to PL-1 even though PL-1 did not pay any of the premiums on the Policy and only Rentals paid the premiums on the Policy.

41

220.    The Co-Conspirators then collected $5 million in life insurance proceeds and distributed those proceeds to the Life Insurance Recipients even though at all times the Co-Conspirators knew that the Policy and the proceeds of the Policy were assets of Rentals only.

221.    The assignment of the Policy to PL-1 and the payment of the proceeds from the Policy to the Life Insurance Recipients were each a "transfer" under applicable Pennsylvania, North Carolina and Florida Law (each an "Life Insurance Transfer" and collectively the "Life Insurance Transfers").

222.    The Life Insurance Transfers should be collapsed and considered one fraudulent transfer transaction.

223.    Each of the Life Insurance Transfers was a transfer of property, or of an interest in property, of Rentals and from Rentals to the Life Insurance Recipients.

224.    As set forth herein, in exchange for each of the Life Insurance Transfers, Rentals did not receive reasonably equivalent value or consideration for the Life Insurance Transfers.

225.    Accordingly, the Life Insurance Transfers constitute avoidable fraudulent transfers pursuant to 12 Pa. C.S. § 5104, N.C.A.C. § 39-23.4 and 726 Fla. Stat. §105 as applicable.

226.    The Life Insurance Recipients have not returned the Life Insurance Transfers (or the monetary equivalent thereof).

## COUNT XIII: FRAUDULENT CONVEYANCE (CONSTRUCTIVE FRAUD)
### (Against the Life Insurance Recipients)

227.    The Bank repeats and realleges all prior allegations.

228.    Each of the Life Insurance Transfers was a transfer of property of Rentals to the Life Insurance Recipients, and each such Life Insurance Transfer constitutes a "transfer" within the meaning of Pennsylvania, North Carolina and Florida, as applicable.

42

229. Each of the Life Insurance Transfers was made with actual intent to hinder, delay, or defraud any entity to which Rentals was or became indebted, on or after the date that such Life Insurance Transfer was made, or such obligation incurred.

230. At the time of each of the Life Insurance Transfers, Rentals was either insolvent or were rendered insolvent because of each Life Insurance Transfer.

231. The total of Rentals' debts has been, and continues to be, greater than its available assets.

232. For the reasons set forth herein, in exchange for each of the Life Insurance Transfers, Rentals did not receive reasonably equivalent value or consideration.

233. Accordingly, the Life Insurance Transfers constitute avoidable fraudulent transfers pursuant to 12 Pa.C.S. § 5105, N.C.A.C. § 39-23.5 and 726 Fla. Stat. §106 as applicable.

234. The Life Insurance Recipients have not returned the Life Insurance Transfers (or the monetary equivalent thereof).

### COUNT XIV: PIERCING THE PROTECTIVE VEIL
### (Against all Equity Owners)

235. Plaintiff repeats and realleges all prior allegations.

236. The Borrowers and PL-1 were undercapitalized. The Borrowers and PL-1 had at all relevant times liabilities which far exceeded their assets because the Borrowers and PL-1 never maintained ownership of any material assets. For example, neither the Borrowers nor PL-1 ever owned any equipment, equipment leases or receivables even though the Borrowers owed the Bank tens of millions of dollars.

237. The Borrowers and PL-1 failed to maintain proper corporate formalities and intermingled corporate and personal affairs. For example, the corporate form was a sham. The Borrowers and PL-1 were not autonomous companies capable of carrying on their own businesses

43

and were used solely to promote the personal affairs of Diggs, Adkison, Jeffcoat and others and perpetrate the Ponzi scheme.

238. The Borrowers and PL-1 were owned, influenced, governed and controlled by their members and the separateness required between members and the limited liability companies ceased to exist because of the misuse of the limited liability companies.

239. Adherence to the fiction of separate existence would lead to injustice, fundamental unfairness or inequity.

240. The protective veils of the Borrowers and PL-1 should be pierced so that the members of the Borrowers and PL-1 are personally held liable under all the causes of action set forth in this complaint against the Borrowers and PL-1.

**WHEREFORE**, based on the foregoing, the Bank respectfully requests that judgment be entered against the Defendants as follows:

A.    On Counts I, II, III, IV, V, VI, VIII and IX,  a money judgment in favor of the Bank and against the Borrowers, Diggs, Adkison, M. Adkison and Jeffcoat jointly and severally in an amount to be determined at trial but which exceeds $55 million, together with punitive damages, interest, costs, attorneys' fees to the fullest extent permitted by law.

B.    On Count VII, a money judgment in favor of the Bank and against the Borrowers jointly and severally in an amount to be determined at trial but which exceeds $55 million, together with interest, costs, attorneys' fees to the fullest extent permitted by law.

C.    On Counts X and XI, an order avoiding the Transfers in favor of the Bank and a money judgment in favor of the Bank against all Defendants except the Life Insurance Recipients jointly and severally for the value thereof in an amount to be determined at trial but which exceeds $55 million, together with interest, costs, attorneys' fees to the fullest extent permitted by law.

D.    On Counts XII and XIII, an order avoiding the Life Insurance Transfers in favor of the Bank and a money judgment in favor of the Bank against the Life Insurance Recipients jointly and severally for the value thereof in an amount to be determined at trial but which exceeds $5 million, together with interest, costs, attorneys' fees to the fullest extent permitted by law.

E.      On Count XIV, an order piercing the protective veils of the Borrowers and PL-1 and a judgment against all the Equity Owners jointly and severally  for all the personal liabilities of Borrowers and PL-1 in an amount to be determined at trial but which exceeds $55 million, together with punitive damages, interest, costs, attorneys' fees to the fullest extent permitted by law.

F.      For other and further appropriate relief.

## DEMAND FOR JURY TRIAL

The Bank respectfully requests a trial by jury on all issues triable to a jury.

Dated:  December 26, 2024

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY PC**

By: */s/ Timothy P. Palmer*
Timothy P. Palmer (PA I.D. #86165)
timothy.plamer@bipc.com
Tyler S. Dischinger (PA I.D. #314299)
tyler.dischinger@bipc.com
Christopher P. Schueller (PA I.D. #92746)
christopher.schueller@bipc.com
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA  15219
(412) 562-8800

*Attorneys for Plaintiff*

4857-4739-2477, v. 8